OPINION
{¶ 1} Michael Salaben appeals the judgment of the Ashtabula County Court of Common Pleas, Probate Division, denying his motion to remove Adult Protective Services, Inc. ("APSI") as Guardian of the Person of his adult autistic son. For the following reasons, we affirm.
 {¶ 2} Substantive and Procedural History
 {¶ 3} Mr. Salaben's son, Christopher, was born May 14, 1986, and had a lengthy history in the Juvenile Court Division stemming from a protracted custody fight between Mr. Salaben and his ex-wife. In 2003, sometime before his eighteenth birthday, Mr. Salaben was granted custody of Christopher by the juvenile court. *Page 2 
 {¶ 4} Christopher reached the age of majority in May 2004. In September 2004, Mr. Salaben filed an application, pro se, to be appointed as guardian of the person and estate.
 {¶ 5} The court appointed Attorney Philip Cordova to represent Christopher in regard to this application and Mr. Salaben also obtained counsel subsequently. At the evidentiary hearing, the court reviewed the Statement of Expert Evaluation prepared by an expert, Dr. Gregory Brant, and the Guardian Investigative Report prepared by Jackie Featsent. These reports indicated Christopher suffers from autism from birth and functions at a second grade level. Both counsel also represented to the court that Mr. Salaben himself also suffers from an autistic-like limitation. The reports indicated Mr. Salaben's lack of insight into Christopher's limitations, his difficulties dealing with Christopher's medication and hygiene, and his limited ability to deal with some of the issues regarding Christopher's educational plan through Ashtabula County Mental Retardation and Developmental Disabilities ("MRDD") at Happy Hearts.
 {¶ 6} Due to Mr. Salaben's limitations, both his counsel and Christopher's counsel agreed at the hearing to have Mr. Salaben withdraw his request to be appointed as guardian of the person of Christopher.
 {¶ 7} On February 1, 2005, the probate court entered a judgment appointing APSI as Christopher's guardian of the person and Mr. Salaben as guardian of the estate. The court also imposed on APSI a restriction not to remove Christopher from Mr. Salaben's home without prior permission and consent of the court.
 {¶ 8} In an effort to determine whether Mr. Salaben could develop the necessary parental skills to deal with Christopher's limitations and needs, the court *Page 3 
conducted quarterly reviews of this matter, which commenced on May 18, 2005. Subsequently, through May, 2007, the court conducted five additional quarterly reviews. APSI and Mr. Salaben appeared at all quarterly reviews. Both Christopher and Mr. Salaben were represented by counsel at each review.
 {¶ 9} In the spring of 2006, APSI reached a conclusion that the medication, education, and hygiene issues had not been adequately addressed by Mr. Salaben. APSI was also frustrated that Mr. Salaben had not enrolled in any parenting classes offered by children services or other programs. APSI came to the belief that a placement outside of the home, in a residential type of setting living with similarly situated adolescents, would be in the best interest of Christopher for his development of independence and socialization skills.
 {¶ 10} Following the August 15, 2006 quarterly review, the court issued an order authorizing APSI to make a placement outside of the home if an appropriate facility or residential placement became available. Notably, Mr. Salaben did not appeal from that decision.
 {¶ 11} Sometime in March of 2007, APSI moved Christopher from his home and placed him at the Manor Home on a trial basis, and several weeks later confirmed the placement.
 {¶ 12} On May 8, 2007, the same day for the sixth quarterly review, Mr. Salaben filed the instant motion to remove APSI as Christopher's guardian of the person based on a claim of unsuitability.
 {¶ 13} The Evidentiary Hearing *Page 4 
 {¶ 14} On August 7, 2007, an evidentiary hearing was held before a magistrate. All parties were represented by separate counsel. Mr. Saleben called six witnesses to testify in his case-in-chief.
 {¶ 15} Michael Tadsen, a Salaben family friend, was the first witness. Prior to the hearing, he had written a letter expressing his support for Mr. Salaben, and counsel for Mr. Salaben sought to have the letter admitted into evidence. Upon objection, the magistrate deemed the writing inadmissible because Mr. Tadsen, who had written the letter, was testifying in person as a witness, and the magistrate asked counsel to elicit testimony from Mr. Tadsen instead. Counsel complied and Mr. Tadsen testified that Mr. Salaben is a good father and an inspiration to him as a father. Mr. Tadsen further testified that it was beneficial for Christopher to live in the community with his father because Mr. Salaben would treat every experience with his children as a learning experience and use whatever tools available such as the environment or other people in the community to teach his children life lessons. No testimony relative to APSI's suitability as guardian was offered.
 {¶ 16} Attorney Jane Hawn-Jackson, who worked as a guardian ad litem ("GAL") for the court for eleven years, was Mr. Salaben's next witness. She testified that she served as GAL for Christopher and his brother for several years during the custody proceedings in the juvenile court. When Mr. Salaben's counsel sought to elicit testimony from her regarding Mr. Salaben's parenting skills during the time she served as Christopher's GAL in the juvenile court proceedings; whether it would benefit for Christopher to live with his father as opposed to a group home; and whether a comprehensive psychological evaluation should have been performed prior to placing *Page 5 
Christopher in a group home, the magistrate sustained multiple objections as these questions related to events which occurred before the court order permitting placement of Christopher in a group home. No testimony relative to APSI's suitability as guardian was offered.
 {¶ 17} Ms. Bechtel, a library clerk for the Rock Creek Public Library, was also called to testify. She stated from 1996 to 1998 Mr. Saleben frequently brought Christopher and his brother to the library to borrow books and videos, and that they would come in to say hello once or twice a year after that. She testified she most recently saw them about a year and half or two years ago. She testified that they also visited her at her home twice a year up until two years ago. The magistrate sustained objections to her testimony regarding her observations as to Christopher's hygiene and Mr. Salaben's parenting ability, as well as her opinion as to whether there would be benefits for Christopher to live in the community as opposed to in a group home, once again basing his rulings on the fact that these questions related to events which occurred before the court order permitting placement in the group home. No testimony relative to APSI's sustainability as guardian was offered.
 {¶ 18} Mr. Salaben next called Lisa Fuller-Grippi, a service and support administrator of MRDD. She testified that Christopher was and is appropriately placed at Manor Home, and that this placement is in his best interest. She stated that a community setting among his peers is more beneficial to him. When Mr. Salaben's counsel attempted to ask her if she would change her opinion if she was told there were thirty-five incident reports regarding Christopher in Manor Home, the magistrate *Page 6 
sustained an objection to this question on the ground that the reports had not yet been introduced as evidence.
 {¶ 19} On crossexamination, Ms. Fuller-Grippi stated she had provided services for Christopher for nearly seven years and that she supported Christopher's move from his family home to the Manor Home due to numerous concerns about the care he received at home, including his poor hygiene and failure by his father to properly administer prescribed medication. She also stated that a doctor of Christopher stopped seeing him because Mr. Salaben was not reliable in bringing him to the appointments. She stated Christopher also lost the care of a dentist because Mr. Salaben had not paid the bills.
 {¶ 20} Ms. Fuller-Grippi further testified that in her twelve years working for the county board, she has had close contact with APSI on behalf of the 2,000 wards she served and she never thought APSI was an unsuitable guardian for any of her wards. She testified that she would have APSI continue to serve as Christopher's guardian and that she would have concerns for Christopher's health and safety if Mr. Salaben were his guardian. She stated the board's ultimate goal is for Christopher to be placed in a community-type setting living with a couple of roommates, and that his placement in the Manor Home is not a final destination, but a part of the process.
 {¶ 21} Upon further crossexamination by Christopher's counsel, Ms. Fuller-Grippi explained that she felt Christopher was appropriately placed at Manor Home because it is a licensed facility that provides Christopher with proper nutrition, medical and dental appointments, and active programming. *Page 7 
 {¶ 22} Mr. Salaben testified next. His counsel sought to present testimony from him to show the "depth and scope" of his relationship with Christopher. The magistrate sustained objections to this testimony on the ground that it would be irrelevant to the instant hearing, which concerned only whether APSI is unsuitable as Christopher's guardian of the person.
 {¶ 23} Mr. Salaben was, however, allowed to testify that he took Christopher to places such as the grocery store or the post office on a daily basis when Christopher lived with him. He also testified that he, Christopher, and Christopher's brother had a closely bonded family before Christopher was removed from his home, and that his girlfriend, Marie Williams, was also bonding with Christopher. He stated after Christopher was removed from his home, he no longer had a family, because Christopher's brother is now "locked up" at his ex-wife's home. He testified he visited Christopher at Manor Home twice a week but was not allowed any unsupervised visits. He stated he wanted Christopher back to "bring[] him up, teaching him," and that Christopher is missing out on "happiness, love, care, learning, experiencing." He also described several incidents when he visited Christopher at Manor Home where other residents were aggressive toward him and his girlfriend.
 {¶ 24} Mr. Salaben's counsel also had him identify photographs depicting Mr. Salaben and his children engaging in activities such as bowling and painting, which the magistrate admitted as evidence. His counsel in addition had him identify several photographs, which purportedly show some scratch marks and bruises on Christopher while he was at Manor Home. *Page 8 
 {¶ 25} On crossexamination, when asked why APSI should be removed as Christopher's guardian, Mr. Salaben stated "they are more into it for themselves." He also mentioned the bruises shown in the photographs, and stated Christopher has regressed in his speech.
 {¶ 26} Mr. Salaben agreed that Christopher was aggressive toward others on a few occasions and that others could sometimes be aggressive towards Christopher as well. When asked if he knew why his girlfriend, Ms. Williams, was not allowed to visit Christopher at Manor Home, Mr. Salaben mentioned there was a rumor that Christopher and Ms. Williams kissed on the lips. Regarding this rumored incident, he stated: "That is one thing I firmly disagree with and I told her [Ms. Williams] that. I said that's one of the rules. You always kiss on the check or the forehead." APSI's counsel asked him, "you heard that when she went to see him they not only kissed on the lips, they French kissed and they were rolling around on his cot. That's the story, isn't it?" to which Mr. Salaben answered: "That's a lie." His counsel objected to this testimony, but the magistrate overruled the objection, stating that such a leading question was allowed on crossexamination.
 {¶ 27} Mr. Salaben also admitted he was aware that APSI would not allow unsupervised visits because he continued to tell Christopher that he was going to get him out of Manor Home and take him home.
 {¶ 28} On crossexamination by Christopher's counsel, Mr. Salaben stated he was told the bruise on his left arm depicted in one of the photographs was the result of having blood drawn. When Mr. Salaben was asked if it would surprise him that Christopher's attorney had learned during a visit to the Manor Home that Christopher *Page 9 
was seeing a doctor because of his propensity to bruise easily, Mr. Salaben answered "no."
 {¶ 29} For his last witness in his case-in-chief, Mr. Salaben called Russell Kinnebrew, Regional Program Director of APSI. Mr. Kinnebrew identified several incident reports involving Christopher that Manor Home sent to APSI. He also testified physical restraints were placed on Christopher on some occasions to prevent him from harming either himself or others. Mr. Salaben's attorney attempted to introduce a correspondence dated February 8, 2006 from Mr. Salaben's attorney to APSI requesting an updated psychological evaluation of Christopher. The magistrate determined the correspondence to be inadmissible as irrelevant.
 {¶ 30} Mr. Salaben's counsel also attempted to question Mr. Kinnebrew regarding a "referral response form" in Christopher's file in APSI's possession (Exhibit MMM). The document was prepared by Walden Residential. It stated that Christopher is inappropriate for that facility because he is much higher-functioning than the other residents. Counsel intended to question Mr. Kinnebrew as to why APSI would place Christopher in Manor Home despite its awareness of this assessment by Walden and the similarity of Walden and Manor Home. The magistrate ruled the document and any testimony by Mr. Kinnebrew about it would be inadmissible because Mr. Kinnebrew had no personal knowledge as to the opinion of Walden Residential expressed in the document. Mr. Kinnebrew answered "no" when asked if he had an evaluation prepared to show Manor Home was an appropriate placement for Christopher
 {¶ 31} On "crossexamination" by APSI's counsel, Mr. Kennebrew testified he felt comfortable recommending Christopher's placement at Manor Home without a *Page 10 
current psychological evaluation. When asked about the incident reports he testified it was not "much of a big deal" for someone in Christopher's situation to generate thirty-five incident reports over a ninety-day period, because the facility would record incidents that would normally occur but are not recorded in a private home setting, and he noted none of the incidents required medical attention. He also stated APSI was directed by the court to place Christopher outside of his home, and Manor Home was the first available facility that he thought was suitable for Christopher. He also stated APSI's goal is to pursue a setting with four individuals or less for Christopher.
 {¶ 32} Neither APSI nor counsel for Christopher called witnesses of their own.
 {¶ 33} The magistrate also admitted into evidence over thirty incident reports involving Christopher prepared by Manor Home and photographs depicting the activities Christopher engaged in with Mr. Salaben. The magistrate, however, excluded Exhibit KKKK, the letter written by Mr. Salaben's counsel to Mr. Kinnebrew, Director of APSI, in February of 2006, which asked APSI to obtain an updated psychological evaluation of Christopher. The magistrate also excluded Exhibit MMM, the referral response form prepared by Walden Residential.
 {¶ 34} On August 31, 2007, the magistrate issued a decision, which recommended that Mr. Salaben's motion be denied, after concluding that Mr. Salaben presented no credible evidence to substantiate his claim that APSI is unsuitable to serve in the capacity as Christopher's guardian of the person.
 {¶ 35} Mr. Salaben filed objections to the magistrate's decision, claiming the magistrate was so biased against him that he was denied due process at the evidentiary *Page 11 
hearing. On April 30, 2008, the court entered a judgment adopted the magistrate's decision.
 {¶ 36} On appeal, Mr. Salaben raises one assignment of error:
 {¶ 37} "The trial court erred by denying appellant's request for a new hearing."
 {¶ 38} Under his assignment of error, he raises four issues. He claims that (1) he was denied a fair hearing due to the magistrate's bias against him; (2) the court should have afforded him an opportunity to present expert testimony by Attorney Hawn-Jackson, Christopher's former GAL in the custody proceedings; (3) the court erroneously excluded evidence regarding the need for a comprehensive psychological evaluation; and (4) the court erroneously concluded that he is not suitable to be Christopher's guardian of the person.
 {¶ 39} This court reviews a trial court's decision to adopt, reject, or modify a magistrate's decision for abuse of discretion. In reAdkins, 11th Dist. No. 2006-L-250, 2007-Ohio-4629, ¶ 17. See, also,In re Ratliff, 11th Dist. Nos. 2001-P-0142 and 2001-P-0143, 2002-Ohio-6586, ¶ 14 (when reviewing an appeal from a trial court's decision to accept or reject a magistrate's decision, an appellate court must determine whether the trial court abused its discretion).
 {¶ 40} "An abuse of discretion is more than error of judgment or law; it implies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. To demonstrate an abuse of discretion, it must be shown that the result is so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead *Page 12 
passion or bias. Nakoff v. Fairview Gen. Hosp. (1996),75 Ohio St. 3d 254, 256, 662 N.E.2d 1, 3.
 {¶ 41} Furthermore, "[a]ny claim of trial court error must be based on the actions of the trial court, not on the magistrate's findings or proposed decision; the focus is on the trial court's actions and not the actions of the magistrate." W. R. Martin, Inc. v. Zukowski, 11th Dist. No. 2006-L-028 and 2006-L-120, 2006-Ohio-6866, ¶ 32; see, also,Berry v. Firis, 9th Dist. No. 05CA0109-M, 2006-Ohio-4924, ¶ 7.
 {¶ 42} We begin our review of the matter at hand with a recognition that probate courts have broad discretion when appointing guardians under R.C. 2111.02(A) and their decisions will not be reversed absent a showing of an abuse of that discretion. See In re Estate ofBednarczuk (1992), 80 Ohio App.3d 548, 551. In determining whether removal is warranted, it is discretionary with the probate court as to whether the guardian should be removed. See In re Guardianship ofBurrows, 11th Dist. No. 2006-P-0118, 2007-Ohio-4764, ¶ 43. See, also,In re Guardianship of Zornes (Aug. 4, 1997), 4th Dist. No. 96CA35, 1997 Ohio App. LEXIS 3549,13 (a probate court's ruling on a motion to remove a guardian will not be disturbed on appeal absent an abuse of that discretion).
 {¶ 43} The first three issues raised by Mr. Salaben challenge the court's ruling regarding the admissibility of several witnesses' testimony and exhibits. Under Ohio Evid. R. 104, the introduction of evidence at trial falls within the sound discretion of the trial court. See, e.g. State v. Heinish (1990), 50 Ohio St.3d 231. "An appellate court which reviews the trial court's admission or exclusion of evidence must limit its review to *Page 13 
whether the lower court abused its discretion." State v. Finnerty
(1989), 45 Ohio St.3d 104, 107.
 {¶ 44} Claimed Bias and Admissibility Regarding Michael Tadsen'sLetter
 {¶ 45} Mr. Salaben contends the following colloquy during the testimony of his first witness, Mr. Tadsen, demonstrates the magistrate's bias.
 {¶ 46} "Q. (By Mr. Winer) Do you feel that it was beneficial to [Christopher] to be able to live in the community with his father as opposed to living in an institution?
 {¶ 47} "Mr. Egan: Objection, Your Honor.
 {¶ 48} "THE COURT: Sustained.
 {¶ 49} "A. Do I answer that?
 {¶ 50} "Q. No, don't answer that. Do you feel that it was beneficial to be able to get out with his father and do activities. . .
 {¶ 51} "Mr. Egan: Objection.
 {¶ 52} "THE COURT: Overruled. I'm going to be bowled over if you don't say yes. Don't you think it's important for a child to be with [] . . .
 {¶ 53} "Q. You may answer.
 {¶ 54} "A. Yes.
 {¶ 55} "Q. And how so?
 {¶ 56} "A. Mike —
 {¶ 57} "THE COURT: Anybody disagree with that statement?
 {¶ 58} "Mr. Egan: No.
 {¶ 59} "THE COURT: Then go to another question. You go it? You got to — *Page 14 
 {¶ 60} "Mr. Winer: We'd like the witness to report his observations to the court, Your Honor, as to how it's been beneficial to [Christopher], in his observations, to be able to be in the community.
 {¶ 61} "THE COURT: How's that going to be relevant? * * *."
 {¶ 62} Mr. Salaben complains that the magistrate was inappropriately sarcastic and repeatedly cut off the testimony of his witness. He claims that "[i]t is obvious from the outset of the hearing that any evidence casting doubt on the wisdom of APSI's decision to institutionalize Christopher and APSI's suitability as guardian of the person will meet with a very chilly reception."
 {¶ 63} Our reading of the transcript shows that the magistrate was understandably frustrated with Mr. Salaben's counsel's attempt to present testimony from Mr. Tadsen regarding whether he felt it was more beneficial for Christopher to reside with his father. Such testimony is clearly irrelevant to the only issue to be resolved at the hearing, i.e., APSI's suitability as Christopher's guardian of the person. The magistrate's commentaries may have been unjudicial, but the transcript reflects he allowed the witness to testify that Mr. Salaben is a good father, that it was beneficial for Christopher to live the community with his father, and that Mr. Salaben treated every activity he engaged in with his children as a learning experience for them.
 {¶ 64} As to the letter prepared by Mr. Tadsen, the magistrate was correct in characterizing this letter as hearsay prohibited by Evid. R. 801, which defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In any event, the *Page 15 
magistrate allowed Mr. Salaben's counsel to elicit the desired testimony from Mr. Tadsen.
 {¶ 65} Admissibility of the Librarian's Observations and LayOpinions
 {¶ 66} A review of the proffered testimony by Ms. Bechtel, a librarian, demonstrates that the magistrate properly prohibited her from testifying regarding Christopher's hygiene, Mr. Salaben's parenting ability, and the potential benefits of Christopher living in the home.
 {¶ 67} Evid. R. 701 allows a lay witness to testify in the form of opinions or inferences which are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." For lay opinion testimony to be admissible, a proper foundation must first be laid to demonstrate that the witness has a basis or foundation for the opinion. The witness must have firsthand knowledge of the subject of the testimony and the opinion must be one a rational person would form based upon the observed facts. State v. Sibert (1994), 98 Ohio App.3d 412,426. Furthermore, we review the decision whether to exclude or admit testimony of a lay witness pursuant to Evid. R. 701 under an abuse of discretion standard. City of Urbana ex rel. Newlin v. Downing (1989),43 Ohio St.3d 109, 113.
 {¶ 68} Our review of the transcript shows that Mr. Salaben's counsel failed to establish a proper foundation for Ms. Bechtel's observations and opinions regarding Christopher's hygiene, Mr. Salaben's parenting ability, and the potential benefits of Christopher living in the home. Her own testimony indicates that she had not seen Christopher for about two years prior to the evidentiary hearing; furthermore, her limited *Page 16 
and rather infrequent contact with Christopher would not be all that helpful to the trial court in understanding Mr. Salaben's parenting ability. Finally, and most importantly, this testimony, like Mr. Tadsen's testimony, is not pertinent to the issue of whether APSI was suitable as Christopher's guardian.
 {¶ 69} The Former GAL as an Expert
 {¶ 70} Mr. Salaben presented Attorney Hawn-Jackson as an expert witness in an attempt to show that it is in Christopher's best interest to remain in his home. The magistrate sustained several objections by APSI to her testimony on the grounds of lack of relevance and foundation. On appeal, Mr. Salaben argues that the trial court erred in limiting the scope of her testimony to support his claim that it was in Christopher's best interest to remain in his father's care and that APSI acted against his best interested in placing him at Manor Home.
 {¶ 71} Pursuant to Evid. R. 702(B), an expert may be qualified by reason of his or her specialized knowledge, skill, experience, training, or education to give an opinion that will assist the jury in understanding the evidence and determining a fact at issue. "Pursuant to Evid.R 104(A), the trial court determines whether an individual qualifies as an expert, and that determination will be overturned only for an abuse of discretion." State v. Hartman (2001), 93 Ohio St.3d 274,285, citing State v. Williams (1983), 4 Ohio St.3d 53, 58.
 {¶ 72} Attorney Hawn-Jackson's testimony reveals that although she had served as GAL for Christopher and his brother in the custody proceedings in the juvenile court between 2001 and 2002, she had no role in the instant guardianship matter nor participated in any of the proceedings in the probate court which began in September of *Page 17 
2004. Therefore, her proffered testimony would not have been based on her observations during the relevant period of time, after Christopher reached the age of majority, and would not be helpful to the court's determination of whether APSI is unsuitable as guardian of the person for Christopher as she did not possess any specialized knowledge regarding Christopher beyond the knowledge possessed by the court or other counsel who had participated in the guardianship proceedings since September 2004. Thus, there is no proper foundation for the testimony by Attorney Hawn-Jackson.
 {¶ 73} Therefore, our review of the record indicates the court properly excluded the testimony by Attorney Hawn-Jackson.
 {¶ 74} Mr. Salaben also complains that the court erred in not allowing Attorney Hawn-Jackson to testify as to whether a comprehensive psychological evaluation should have been performed prior to placing Christopher in a group home.
 {¶ 75} Regarding this issue, the court stated in its judgment entry that it had already reviewed an expert evaluation of Christopher prior to declaring Christopher to be an incompetent adult based on his diagnosis of autism. The court also noted Christopher's own attorney never made a request for a comprehensive psychological evaluation during the guardianship proceedings. If indeed Attorney Hawn-Jackson had any opinion, it was not proffered. Thus, we do not find the court abused its discretion in not allowing Mr. Salaben to present Attorney Hawn-Jackson's opinion, if any, as to the need for a comprehensive psychological evaluation at this stage of the proceedings.
 {¶ 76} Claimed Bias and Error Regarding Testimony of MRDDRepresentative *Page 18 
 {¶ 77} Regarding the rulings during the testimony by Ms. Fuller-Grippi, a service administrator from MRDD, whom Mr. Salaben called to testify on direct examination, he complains that the court disallowed her testimony "when it was clear that the answer might have been adverse to the corporate guardian" yet permitted opposing counsel to elicit from her opinions adverse to him.
 {¶ 78} Our review of the transcript does not reveal impropriety or error by the court. Her testimony shows that she had provided services for Christopher for nearly seven years on behalf of MRDD. She testified on direct examination by Mr. Salaben's counsel that Christopher's placement at Manor Home was in his best interest for the time being. Mr. Salaben complains the court allowed her to testify on crossexamination that she would have APSI continue to serve as Christopher's guardian and furthermore that she would have concerns for Christopher's health and safety if he was returned to his home. Because her testimony reflects specific reasons upon which her opinion rests, we do not find an abuse of discretion by the court in admitting this testimony.
 {¶ 79} Mr. Salaben also refers us to the portion of the transcript where his counsel attempted to elicit testimony from Ms. Fuller-Grippi as to whether it would be in Christopher's best interest for APSI to allow only supervised visits with his father and disallow any visits with an individual by the name of Marie Williams. The magistrate sustained an objection by APSI's counsel to this testimony on the ground that no testimony had been presented to the court to indicate the identity of Ms. Williams. While this may be characterized as a hypertechnical interpretation of foundational requirement, we do not see an abuse of discretion in not allowing the testimony, and again emphasize that such evidence would not directly relate to APSI's suitability. *Page 19 
 {¶ 80} The Examination of the Director of APSI
 {¶ 81} Mr. Salaben's counsel called Mr. Kinnebrew to testify in his case-in-chief, primarily for the purpose of identifying the incident reports (prepared by the group home). Despite the fact that Mr. Kinnebrew, as Director of APSI, was obviously an adverse party, Mr. Salaben's counsel never identified his examination of Mr. Kinnebrew at any point during the proceeding to be "as if on crossexamination." As a result, the magistrate treated the questioning of Mr. Kinnebrew as a direct examination throughout the proceeding and treated APSI's counsel's questioning of Mr. Kinnebrew, the representative of his own client, as crossexamination. Consequently, the magistrate interrupted Mr. Kinnebrew's testimony when he felt Mr. Salaben's counsel was challenging Mr. Kinnebrew's answer to his questions and admonished Mr. Salaben's counsel that no request to declare the witness "hostile" had been made. The magistrate also permitted APSI's counsel to ask Mr. Kinnebrew certain leading questions.
 {¶ 82} The transcript reflects the following colloquy, which occurred when APSI's counsel, while examining Mr. Kinnebrew, referenced an exhibit previously introduced by Mr. Salaben's counsel regarding the protocol used for the use of physical restraints at Manor Home. APSI's counsel questioned Mr. Kinnebrew as to whether the protocol was similar to the practice in a behavior plan first instituted at Happy Hearts, a school Christopher attended.
 {¶ 83} "Mr. Winer: Your honor, leading here. This is his client. He's asking an awful lot of questions — *Page 20 
 {¶ 84} "THE COURT: No. This is crossexamination. He is your witness because you called him. You didn't declare him in [any way] or manner hostile pursuant to the statutory proceedings so —
 {¶ 85} "Mr. Winer: He's the opposing party, Your Honor. I mean this is the opposing party. It's not like this is just a witness [who] could possibly be neutral somehow.
 {¶ 86} "THE COURT: You called him as your witness. You didn't declare hostility. He has the right to cross-examine the witness.
 {¶ 87} "Mr. Winer: He called him as on cross. He's on the opposing party. I think that's-
 {¶ 88} "THE COURT: Mr. Winer, you did not, all right? You never made such a reference. It's permissible, it's under the statute and counsel, if I am wrong in that ruing, please correct me at the outset. Were there any declarations of hostility requests by Mr. Winer?
 {¶ 89} "[APSI's counsel]: No, Your honor.
 {¶ 90} "Mr. Winer: * * * Obviously this is on crossexamination when I examined him but, all right."
 {¶ 91} The confusion could have been easily avoided if Mr. Salaben's counsel had announced that he was calling Mr. Kinnebrew "as if on crossexamination" in his case-in-chief thereby alerting the magistrate of his intentions, but it must be noted that a "party's ability to impeach any witness and to use leading question when examining an adverse party or witness identified with an adverse party eliminates any reason to continue the obsolete practice of calling an adverse party `as if on crossexamination.'" *Page 21 
Markus, Trial Handbook for Ohio Lawyers (2008), 504, § 16:11. As Judge Markus observes, Evid. R. 611(C) does not refer to calling a witness "for crossexamination" where it allows leading questions to be posed where a party calls a witness identified with an adverse party. "By its failure to provide any such procedure, Evidence Rule 611 may well supersede R.C. 2317.07 and R.C. 2317.52 which authorized it." Id. § 16:11.
 {¶ 92} Moreover, a court may permit the adverse party's counsel to examine his own client's representative immediately after the witness was taken as if on crossexamination, or the court may refuse to permit such an examination. See Cities Service Oil Co. v. Burkett (1964),176 Ohio St. 449 and Seley v. G. D. Searle Co. (1981), 67 Ohio St. 2d 192. This truly is "largely a matter of semantics." Marcus. § 16.11.
 {¶ 93} Evid. R. 611(C) governs the ability of counsel to cross-examine its own witness by the use of leading questions, providing that "[l]eading questions should not be used on the direct examination of a witness except as is necessary to develop his testimony. Ordinarily leading questions should be permitted on crossexamination. When a party calls a hostile witness, an adverse party, or a witness identified withan adverse party, interrogation may be by leading questions." Civ. R. 611(C) (emphasis added). See State v. McLean (June 16, 2000), 11th Dist. No. 98-L-239, 2000 Ohio App. LEXIS 2664, *4-5. As Professor Giannelli noted, "[a]n adverse party and a witness identified with an adverse party are automatically considered `hostile' witnesses. This provision generally follows prior Ohio law. Persons identified with an adverse party include employees * * *" Giannelli and Snyder, Evidence (2001) 505 § 611.11.
 {¶ 94} While the magistrate was incorrect in his assertion that Mr. Salaben's counsel was required to ask that the witness be declared "hostile," no prejudice *Page 22 
resulted. The first discussion relating to crossexamination of his own witness came during Mr. Salaben's counsel's questioning of Mr. Kinnebrew relative to his classification of Manor Home as a "group home" versus an "institution." When Mr. Salaben's counsel appeared to be challenging the witness' classification, the magistrate admonished him solely for arguing with the witness after the question had been asked and answered. Again, and most importantly, this line of questioning did not relate to ASPI's suitability as guardian, which was the sole issue before the court.
 {¶ 95} As set forth in the colloquy above, the second discussion as to Mr. Salaben's counsel's failure to ask the court to declare Mr. Kinnebrew hostile occurred after Mr. Salaben's counsel objected to ASPI's counsel's "crossexamination" of Mr. Kinnebrew.
 {¶ 96} We note that after the colloquy, no further objections as to the testimony of Mr. Kinnebrew were made by Mr. Salaben's counsel, and furthermore the record does not reflect the evidence adduced during the examination of Mr. Kinnebrew by APSI's counsel to be prejudicial.
 {¶ 97} "The allowing or refusing of leading questions in the examination of a witness must very largely be subject to the control of the court, in the exercise of a sound discretion. In the absence of an abuse of discretion, the trial court's ruling must stand." Ramage v.Central Ohio Emergency Services, Inc. (1992), 64 Ohio St.3d 97, paragraph six of syllabus, citing Seley v. G.D. Searle Co. (1981),67 Ohio St.2d 192, 204.
 {¶ 98} Thus, we find Mr. Salaben's complaint regarding the court's ruling on the admissibly of Mr. Kinnebrew's testimony to be without merit. *Page 23 
 {¶ 99} Admissibility of Exhibits
 {¶ 100} Mr. Salaben also challenges the court's exclusion of Exhibit KKKK and MMM as evidence. Exhibit KKKK consists of a correspondence written by Mr. Salaben's counsel to Mr. Kinnebrew, Director of APSI, in February of 2006, requesting that APSI obtain an updated psychological evaluation on Christopher. We do not find an abuse of discretion by the court in not admitting this correspondence into evidence, because we fail to see how a mere request made by Mr. Salaben's counsel for an updated evaluation of Christopher, unaccompanied by any opinion of an objective party supporting such a request, would be relevant or material to the issue under adjudication, i.e., whether APSI is suitable as Christopher's guardian of the person.
 {¶ 101} Exhibit MMM consists of a "referral response form" prepared by Walden Residential, which stated that it would be inappropriate to place Christopher at that facility because he is much higher-functioning than the other residents. Mr. Salaben's counsel intended to question Mr. Kinnebrew as to why APSI would place Christopher in Manor Home despite its awareness of this assessment by Walden Residential. The magistrate considered the document and any testimony by Mr. Kinnebrew regarding it to be inadmissible because Mr. Kinnebrew did not have personal knowledge as to the document and the opinion expressed therein. The court, in its judgment entry, stated the document was not admissible because it was not properly authenticated. We agree and find no abuse by the court for excluding this document.
 {¶ 102} Mr. Salaben frames his second and third issue under his assignment of error as concerning the court's exclusion of (1) Ms. Hawn-Jackson's testimony, and (2) the referral response form prepared by Walden Residential. He argues the evidence *Page 24 
would have demonstrated a need for a comprehensive psychological examination of Christopher.
 {¶ 103} We have already addressed the propriety of the court's exclusion of those evidentiary materials based on the rules of evidence. Moreover, the record indicates that at the 2004 evidentiary hearing conducted by the court on Mr. Salaben's application for an appointment as guardian of the person and estate, the court received a Statement of Expert Evaluation from Dr. Gregory Brant and also the Guardian Investigative Report by Jackie Reatsent. Based on the evidence presented at that hearing, the court entered a judgment on February 1, 2005, appointing APSI as guardian of the person and, following the fifth quarterly review, issued an order on August 15, 2006, authorizing APSI to make an outside of the home placement for Christopher when an appropriate facility became available. This order was not appealed by Mr. Salaben, yet he argues now that APSI is unsuitable as Christopher's guardian of the person because there was no "update" or "comprehensive" psychological evaluation prior to placing him at Manor Home. The August 15, 2006 order by the court did not require further psychological evaluation prior to placing Christopher outside of the home. Therefore, APSI's failure to do so does not in itself establish its unsuitability as Christopher's guardian of the person.
 {¶ 104} The Issue of Mr. Salaben's Suitability
 {¶ 105} Finally, Mr. Salaben takes issue with the following statement by the court in its judgment:
 {¶ 106} "Mr. Salaben's testimony clearly demonstrates what the Court originally found, he is not suitable to be [Christopher's] Guardian of the Person. He lacks real *Page 25 
insight as to [Christopher's] autism and how best to deal with it. As noted and observed during the course of his testimony, Mr. Salaben's limitations are profound."
 {¶ 107} The instant hearing was held upon the motion of Mr. Salaben to determine the sole issue of whether APSI is unsuitable as Christopher's guardian. Mr. Salaben's suitability is immaterial to the disposition of that issue. Therefore, the trial court should have refrained from any making any findings regarding his unsuitability. However, this statement does not affect our determination that the court did not abuse its discretion in adopting the magistrate's decision denying his motion to remove APSI, because we, as the trial court did, find that Mr. Salaben failed to present competent and credible evidence substantiating his claim that APSI is unsuitable as Christopher's guardian of the person.
 {¶ 108} Mr. Salaben's primary contention on appeal is that the magistrate was biased and that the court erred in not providing him a new hearing. The law requires that we presume the magistrate, as a judicial officer, is unbiased and unprejudiced. "In the absence of a personal or pecuniary conflict, or other conduct suggestive of bias, the presumption is that the magistrate performed his duties faithfully and according to law." State v. Morgan (1988), 55 Ohio App.3d 182, 184. See, also, In re Disqualification of Olivito (1994), 74 Ohio St.3d 1261, 1263
(the law presumes that a judge is unbiased and unprejudiced in matters over which he or she presides; bias or prejudice must be strong enough to overcome this presumption of integrity).
 {¶ 109} Our review of the transcript shows the magistrate sustained and overruled objections made by both parties, but sustained more objections by APSI's counsel. *Page 26 
This in itself, however, does not necessarily demonstrate bias as perceived by Mr. Salaben. It could simply be a reflection of counsel's choices in presenting testimony.
 {¶ 110} Our review of the transcript reflects that the magistrate made certain remarks on occasions that are at odds with his duty as a judicial officer to be patient and courteous to litigants. See: Code of Judicial Conduct, Canon 3(B)(4). The transcript shows, however, that the magistrate became understandably frustrated at times with Mr. Salaben's counsel for his repeated attempts to introduce testimony that was irrelevant or without sufficient foundation.
 {¶ 111} Finally, we commend Mr. Salaben's efforts in seeking the best living arrangement possible for Christopher. However, the issue to be adjudicated at the instant hearing pertained solely to whether APSI is unsuitable as Christopher's guardian of the person of Christopher. Our review of the record shows Mr. Salaben failed to present competent, credible evidence to substantiate his claim that APSI is unsuitable as Christopher's guardian of the person. Therefore, the court did not abuse its discretion in adopting the magistrate's decision denying Mr. Salaben's motion to remove APSI as the guardian of the person of Christopher. The assignment of error is overruled.
 {¶ 112} The judgment of the Ashtabula County Court of Common Pleas, Probate Division, is affirmed.
COLLEEN MARY O'TOOLE, J., concurs in judgment only, DIANE V. GRENDELL, P.J., dissents with a Dissenting Opinion. *Page 27